

FILED

NORTH CAROLINA                     IN THE GENERAL COURT OF JUSTICE
CABARRUS COUNTY    2022 JUN 22   ⊃ l2: 3 SUPERIOR COURT DIVISION
                                   CASE NO.

CABARRUS COUNTY.C.S.C.

| | |
|---|---|
| Progressive Southeastern Insurance<br>Company A/S/O Patrick King, Laura Yost,<br>William Schoonmaker, Charles Greene and<br>Scott Whittle, | )<br>) ⅤƟ<br>)<br>)<br>)<br>) |
|           Plaintiff, | )<br>) |
| vs. | )<br>) |
| Norcold, Inc. | )<br>) |
|           Defendant. | )<br>) |

**COMPLAINT**

COMES NOW Plaintiff, Progressive Southeastern Insurance Company, as Subrogee of
Patrick King, Laura Yost, William Schoonmaker, Charles Greene and Scott Whittle (hereinafter
"Plaintiff"), by and through their undersigned counsel, and Complains of the Defendant, Norcold,
Inc. (hereinafter "Norcold" or "Defendant") and states and alleges as follows:

## THE PARTIES

1.      Plaintiff, Progressive Southeastern Insurance Company, is a domestic corporation
authorized to do business as a property insurer in North Carolina.

2.      Defendant, Norcold, Inc., is and has been at all material times a corporation
organized and existing under the laws of the State of Delaware with a principal place of business
located in Ohio. Norcold, Inc. has a registered agent in Delaware of Corporation Service

Company, 251 Little Falls Drive, Wilmington, Delaware 19808, a registered agent in the State of Ohio of Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, Ohio 43215, and a registered agent of Corporation Service Company, 2908 Poston Avenue, Nashville, TN, 37203.

## VENUE AND JURISDICTION

3.      Venue and subject matter jurisdiction are proper in this Court in that the incident which gave rise to this action occurred in Cabarrus County, occurred in Cabarrus County, and the amount in controversy is more than $25,000, exclusive of interests and costs.

4.      This Court has personal jurisdiction over Defendant under North Carolina's "Long Arm Statute," in that this action involves damages that were incurred in the State of North Carolina and this Defendant:

(a) transacts business in this State;

(b) contracts to supply services or things in the State;

(c) caused tortious damages in this State by an act or omission outside this State and regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this State; and/or

(d) produces, manufactures, or distributes goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

5.      Subjecting Defendant to the jurisdiction of this Court does not offend traditional notions of fair play and substantial justice in that this Defendant purposefully availed itself of the laws of the State of North Carolina by:

(a)    designing the product that is the subject of this action for the North Carolina market;

(b)    advertising in and/or to the North Carolina market;

(c)    establishing channels for providing regular advice to users or consumers of this product in the State of North Carolina;

(d)    marketing this and other products through a distributor who has agreed to serve as a sales agent, retailer, or dealership in the State of North Carolina;

(e)    transporting products to persons in the State of North Carolina for use by contractors, consumers and homeowners; and/or

(f)    otherwise engaging in continuous and systematic contacts with the State of North Carolina as may be developed through discovery.

## FACTUAL BACKGROUND

6.    This matter arises from a fire on or about November 15, 2020 ("the fire" or "the subject fire") originating from a Norcold-brand refrigerator and its component parts which, on information and belief, was affixed to and sold with a 2011 recreational vehicle or camper owned by Rafeal Leon ("Leon"), a non-party.

7.    On information and belief, the VIN number for the camper owed by Leon was: 4YDF38126BR800779 DECODED: Keystone RV - Raptor / Carbon (2011) and was purchased in 2011 from Sun Coast RV in St. Augustine, FL and which is now known as Camping World.

8.    At the time of the fire, the camper owned by Leon was stored at Life Storage located at 189 Harrisburg Veterans Road, Harrisburg, North Carolina.

9.     The fire caused damage to other campers stored at Life Storage, including the campers of Plaintiff's insureds as designated herein: Patrick King, Laura Yost, William Schoonmaker, Charles Greene, and Scott Whittle.

10.     On a date prior to the fire, Progressive Southeastern Insurance Company ("Progressive") issued an individual policy of insurance ("Polices" or "Policy") for recreational vehicles or campers individually owned by Patrick King, Laura Yost, William Schoonmaker, Charles Greene, and Scott Whittle (the "Insureds").

11.     Pursuant to the terms of the Policies, Progressive is contractually and equitability subrogated to the rights of the Insureds.

12.     The Norcold-brand ammonia-based refrigerator at issue in this case (the "Norcold refrigerator" or "the subject refrigerator" or "the refrigerator") was designed, manufactured, and placed into the stream of commerce by Defendant, Norcold, Inc.

13.     The Norcold refrigerator has a defect that makes it overheat and that defect manifested itself prior to and during the fire.

14.     The defect led to the fire, resulting in property and business interruption damages in an amount to be determined at trial.

15.     The refrigerator was installed as original equipment in the camper owned by Leon.

16.     Plaintiff has not yet been able to determine the date that the camper, with the refrigerator included, was delivered to its first purchaser for use or consumption, but the model year of the camper is 2011.

17.     The problem with the subject refrigerator is with its cooling unit.

18.     The boiler tube of the cooling unit attached to the back of the subject refrigerator has a tendency to fail and leak flammable gases, including hydrogen gas, at high pressure into the refrigerator cabinet, igniting a fire.

19.     The Norcold gas absorption refrigerators share the same technology, which involves a process whereby a solution of ammonia, water, sodium chromate, and hydrogen gas is heated by electricity or propane until it boils (approximately 400 degrees Fahrenheit), releasing ammonia gas.

20.     These gas absorption refrigerators have caused and/or contributed to thousands of fires since at least 1999.

21.     The gas circulates through a series of tubes at approximately 450 psi.

22.     As the ammonia gas is first condensed to liquid, and then evaporated through interaction with the hydrogen gas, heat is removed from the refrigerator box, causing the temperature in the box to decrease and providing the refrigeration effect.

23.     The series of tubes is referred to as a "cooling unit," and includes the heat source (propane and electric), as well as a condenser, evaporator, absorber, and solution tank.

24.     The section of the cooling unit where the electric heat inputs are welded to the cooling unit, and where the cooling unit tubing is dimpled to hold an interior "percolator tube," is referred to as the "boiler tube."

25.     The Norcold gas absorption refrigerator cooling units were designed as sealed units, without gauges or other devices to monitor the internal condition of the cooling unit, or the level of cooling solution the cooling unit contained.

26.     Each cooling unit was charged with the cooling solution and hydrogen gas at the factory, to an internal pressure of 350 p.s.i.

27.     Because of the extreme flammability and explosiveness of the hydrogen gas, the cooling units were designed not to leak.

28.     Norcold at all times recognized and understood that a cooling unit that leaked presented a serious risk of fire, property damage, injury and death to anyone in the general vicinity of their product.

29.     The Norcold gas absorption refrigerators manufactured between December 1996 and October 2012 share a common design defect, which was and is a propensity for the steel tubing used in the cooling unit boiler tubes to develop leaks.

30.     The subject refrigerator, having been installed in a model year 2011 camper manufactured toward the end of 2011 or early part of 2012, would fall within the October 2012 date when Norcold was manufacturing defective refrigerators.

31.     For such refrigerators, the root cause of boiler tube leakage is internal corrosion, caused by a combination of the stresses introduced into the tubing during the fabrication and manufacturing process; the cyclic and thermal stresses placed on the tubing during normal operation of the refrigerators - including steep temperature gradients introduced through electronic heater controls - high temperature and high pressure; and the chemical interaction of the corrosive cooling solution with the low carbon steel tubing used for the boiler tube.

32.     The internal corrosion was and is a mechanical process, *i.e.*, once started, the corrosion cannot be stopped, but continues to eat away at the boiler tube walls regardless of whether the refrigerator is on or off.

33.     The internal corrosion causes pits and cracks to develop, which in turn causes thinning of the boiler tube wall.

34.     When the boiler tubing thins to the point where it can no longer withstand the internal pressure of the cooling unit, the boiler tubing fails and develops microscopic cracks that leak flammable gases at high pressure.

35.     Norcold, at all times relevant hereto, was aware that a leaking boiler tube presented a serious safety risk of fire.

36.     First, a high-pressure leak of flammable cooling solution and hydrogen gas could be ignited by any number of competent ignition sources in and around the refrigerator and the RV or boat it was installed in, including the refrigerators' electric heaters and propane pilot light, or any momentary arc in a light switch or electrical panel.

37.     The high-pressure release of hydrogen gas was also liable to "self-ignite," *i.e.*, ignite a high-pressure gas fire due to shock or static electricity, regardless of whether the refrigerator was on or off, or otherwise plugged into electric power.

38.     Finally, if the solution in the cooling unit was reduced by as little as twenty percent (20%) due to a cooling unit leak, the cooling unit was liable to experience a "run-away heating event" that caused the steel tubing to reach temperatures in excess of 1,000 degrees Fahrenheit, resulting in fires, either by ignition of the escaping flammable gases, or by ignition of the combustible unprotected wood inside the refrigerator compartment through radiant heat.

39.     Norcold has been repeatedly sued for damages arising from fires caused by their defective gas absorption refrigerators.

40.     As a result of such prior litigation, Norcold has repeatedly been apprised of the above-described defects in their gas absorption refrigerators, and the causal connection between the defects and the resulting fire claims.

41.     Norcold also maintains certain Incident Logs, warranty/return databases, and Incident Files of claims, including claims that do not end up in litigation.

42.     As a result of Norcold's prior litigation and prior documentation of the continuing fire claim history of their gas absorption refrigerators - including the Incident refrigerator, warranty/return databases, and Incident Files – Norcold's senior management has had actual knowledge of the existence of the above-described design defects, and of the serious safety risks owners of Norcold's gas absorption refrigerators unknowingly faced each time they used the product in a reasonably foreseeable manner.

43.     Notwithstanding their knowledge of the safety-related defects inherent in their gas absorption refrigerators, and the serious safety risks those defects posed to owners and the general public, Norcold continued to market, sell and otherwise place their defective refrigerators into the stream of commerce up to and including October 2012.

44.     For example, between December 1996, and October 10, 2012, Norcold manufactured, marketed, sold and otherwise placed 178,000 Norcold 1200 Series gas absorption refrigerators into the stream of commerce.

45.     Norcold's refrigerators shared the identical cooling unit design, and the identical defectively designed boiler tube assembly.

46.     During this period, Norcold received thousands of reports of fires involving their refrigerators.

47.     During this same time period, Norcold received more than 4,800 additional warranty claims based on cooling units returned from the field, all of which Norcold determined to be "cu leakers."

48. Despite this actual knowledge, Norcold did not during the period of 1996 to October 2012 change the specifications or design of their cooling unit boiler tube assembly or safety fuse plug to render their refrigerators safe to use for their intended purpose - notwithstanding the fact that a safer alternative design was at all times readily available, feasible and cost effective - nor did they provide warnings or adequate instructions to owners that would provide sufficient information through which the latter could protect themselves.

49. On information and belief, Rafeal Leon purchased HIS camper in 2011 in Florida.

50. At the time of purchase, the camper contained, as original equipment, the subject defect Norcold refrigerator.

51. On information and belief, Leon did not make any alterations or modifications to the refrigerator.

52. On information and belief, the refrigerator was substantially the same as when it left Norcold's possession, though Plaintiff reserves the right to supplement or amend if in the course of discovery there are indications of any recall kits or items – that may also have failed – having been applied to the refrigerator.

53. On a date prior to the fire, Plaintiff issued policies of insurance that were in effect on the date of the fire to Plaintiff's Insureds as the owners of their individual campers.

54. As a result of the fire, Plaintiff's Insureds made property insurance claims with Plaintiff.

55. Plaintiff is subrogated to the insureds' rights to bring this action against those responsible for their damages.

56. Plaintiff proceeds with this action based on the doctrine of conventional subrogation.

## COUNT I: NEGLIGENCE AGAINST NORCOLD, INC.

57. Plaintiff incorporates the paragraphs preceding Count I as though fully set forth herein.

58. This count does not incorporate the allegations in any of the other counts, unless specifically stated herein.

59. Defendant designed, manufactured, sold, and/or marketed the subject refrigerator.

60. As the manufacturer and seller of the subject refrigerator, this Defendant had a duty to use reasonable care in the design, development, production, and marketing of the subject product.

61. As the manufacturer and seller of the subject refrigerator, this Defendant also had a duty to use reasonable care as to its warnings, post-sale, of potential problems with the subject product.

62. These duties extended to all reasonably foreseeable users or consumers of the subject products and those who could be damaged from them, including Leon and the Insureds.

63. This Defendant breached its aforesaid duty to in that it:

    a.    designed the refrigerator in such a way that the boiler in the refrigerator is susceptible to overheating;

    b.    designed the tubing for the refrigerator with thin walls that are susceptible to cracking in the course of such overheating;

    c.    designed the refrigerator so that when the tubes crack, hydrogen, water and ammonia escape hitting the red-hot boiler tube or gas flame and resulting in ignition.

    d.    failed to properly inspect and test the design and construction of the refrigerator before distributing the product en masse to the public;

e.      failed to warn the user/consumer and/or installer or repairer of the substantial risk of fire or similar peril presented by the refrigerator;

f.      failed to provide the user/consumer or installer or repairer with a product that was capable of withstanding damage to its integrity resulting from expected and typical use;

g.      failed and/or omitted to do those things necessary to avoid an unreasonable risk of harm to real and personal property of the user/consumer or installer or repairer of the refrigerator;

h.      failed to comply with the applicable codes, regulations, guidelines, policies, procedures and/or industry customs and/or practices;

i.      committed the acts alleged in the paragraphs preceding Count I; and

j.      otherwise failed to use due care under the circumstances.

64.     The subject product was defective and unreasonably dangerous.

65.     The subject product was in the defective condition at the time that it left the possession or control of the Defendant.

66.     As a direct and proximate result of the aforesaid negligent, careless and/or reckless acts and/or omissions, and the affirmative concealment of the defective nature of the subject product, Plaintiff' Insureds sustained property damages in amounts in excess of $25,000 for which Plaintiff is subrogated and for which Defendant is legally liable.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against this Defendant in an amount in to be determined at trial, pre-judgment interest, together with attorneys' fee and costs as allowed by law.

## COUNT II: STRICT LIABILITY AGAINST NORCOLD, INC.

67.     Plaintiff incorporates the paragraphs preceding Count I as though fully set forth herein.

68.     This count does not incorporate the allegations in any of the other counts, unless specifically stated herein.

69.     Defendant designed, manufactured, sold, and/or marketed the subject refrigerator.

70.     The subject product is the type of products that this Defendant is in the business of designing, manufacturing, selling, and/or marketing.

71.     Defendant placed the subject product into the stream of commerce.

72.     The subject product is the type of product that Defendant is in the business of manufacturing and/or selling and/or distributing.

73.     Defendant expected that the subject product would reach the user or consumer without substantial change in the condition in which they were was sold.

74.     The product reached the users and/or consumers without substantial change in the conditions in which they were sold and/or distributed.

75.     The Leons were users and/or consumers of the subject product.

76.     The Insureds had property other than the subject product in the zone of danger of the subject product.

77.     The Leons used the subject product for the purpose and in the manner for which it was designed and intended and/or in a manner that was reasonably foreseeable.

78.     The subject product was defective and unreasonably dangerous in that it had a tendency to cause fires for the reasons described in the allegations preceding Count I in the ordinary course of their use.

79.     The subject product was in the defective condition at the time that it left the possession or control of the Defendant.

80. Defendant failed to adopt a safer, practical, feasible, or otherwise reasonable alternative design or formulation for the product that could then have been reasonably adopted and would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

81. As a direct and proximate result of the aforesaid acts and/or omissions, Plaintiff's Insureds sustained property damages in amount in excess of $25,000 for which Plaintiff are subrogated and for which Defendant is legally liable.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in their favor and against this Defendant in an amount in to be determined at trial, pre-judgment interest, together with attorneys' fee and costs as allowed by law.

### COUNT III: GROSS NEGLIGENCE AGAINST NORCOLD. INC.

82. Plaintiff incorporates the paragraphs preceding Count I as though fully set forth herein.

83. This count does not incorporate the allegations in any of the other counts.

84. Defendant designed, manufactured, sold, and/or marketed the subject refrigerator.

85. As the manufacturer and seller of the subject refrigerator, Defendant had a duty to use reasonable care in the design, development, production, and marketing of the subject product.

86. This duty extended to all reasonably foreseeable users or consumers of the subject product and those who could be damaged from it, including the Leons.

87. Defendant breached its aforesaid duty and also acted with recklessness and wanton and willful disregard for the safety of Plaintiff's insureds in that it:

a. designed the refrigerator in such a way that the boiler in the refrigerator is susceptible to overheating;

b. designed the tubing for the refrigerator with thin walls that are susceptible to cracking in the course of such overheating;

c. designed the refrigerator so that when the tubes crack, hydrogen, water and ammonia escape hitting the red-hot boiler tube or gas flame and resulting in ignition.

d. failed to properly inspect and test the design and construction of the refrigerator before distributing the product en masse to the public;

e. failed to warn the user/consumer and/or installer or repairer of the substantial risk of fire or similar peril presented by the refrigerator;

f. failed to provide the user/consumer or installer or repairer with a product that was capable of withstanding damage to its integrity resulting from expected and typical use;

g. failed and/or omitted to do those things necessary to avoid an unreasonable risk of harm to real and personal property of the user/consumer or installer or repairer of the refrigerator;

h. failed to comply with the applicable codes, regulations, guidelines, policies, procedures and/or industry customs and/or practices;

i. committed the acts alleged in the paragraphs preceding Count I; and

j. otherwise failed to use due care under the circumstances.

88. The subject product was defective and unreasonably dangerous.

89. The subject product was in the defective condition at the time that it left the possession or control of the Defendant.

90. As a direct and proximate result of the aforesaid negligent, careless, and/or reckless acts and/or omissions, wanton and willful disregard for the safety of others, Plaintiff's Insureds sustained property damages in amount in excess of $25,000 for which Plaintiff is subrogated and for which Defendant is legally liable.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against this Defendant in an amount in to be determined at trial, pre-judgment interest, together with attorneys' fee and costs as allowed by law.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues triable before a jury.

Respectfully submitted this 16 day of June 2022 by:

B. Elizabeth Todd, Esq.
*Attorney for Plaintiff*
N.C. State Bar No. 23800
Law Offices of B. Elizabeth Todd, PLLC
3440 Toringdon Way, Suite 310
Charlotte, NC 28277
Tel. (704) 644-0929
Cell (704) 737-3725
Fax (980) 939-6374
Email: Elizabeth@etoddlaw.com